Receipt number AUSFCC-11516660

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| **HENNEPIN COUNTY, MINNESOTA,**<br>*Plaintiff*,<br>*v.*<br>**THE UNITED STATES,**<br>*Defendant*. | **Case No.** 26-1541 C<br><br>**Judge** ______________ |

## COMPLAINT

Plaintiff Hennepin County, Minnesota respectfully brings this bid protest and alleges as follows:

## INTRODUCTION

1. This bid protest challenges the unlawful decision by the U.S. Department of Health and Human Services (HHS) to award an $86.1 million procurement contract to Guidehouse, Inc. to be the sole national provider of Tier 1 of the Teen Pregnancy Prevention (TPP) Program.

2. The TPP Program "is a national, evidence-based grant program that funds diverse organizations working to prevent teen pregnancy across the United States."[1]

3. Congress created the TPP Program in 2009. *See* Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). Since then, Congress has used the same statutory criteria in renewing the program annually. *See, e.g.,* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281 (2026) (hereinafter "2026 Appropriations Act").

4. As mandated by Congress, HHS must administer the TPP Program through a two-tiered structure. After setting aside up to 10 percent for support activities, 75 percent of appropriated

[1] HHS Office of Population Affairs, *Teen Pregnancy Prevention Program*, https://tinyurl.com/48mbzxy6 (last visited Oct. 12, 2026).

funds must go to "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors" (Tier 1) and the remaining 25 percent "shall be" used "for research and demonstration grants to develop . . . and test additional models and innovative strategies" to accomplish that same goal (Tier 2). *Id.*

5. Congress has further provided that HHS must award the TPP Program's Tier 1 and Tier 2 funds through "*competitive contracts and grants to public and private entities*." *Id.* (emphasis added).

6. Prior to HHS's unlawful procurement contract with Guidehouse, public and private entities with expertise in teen pregnancy prevention participated in the TPP Program by applying for and receiving Tier 1 and Tier 2 cooperative agreements that HHS awarded through competitive Notices of Funding Opportunities (NOFOs).

7. For example, in 2023, HHS published NOFOs soliciting applications for a new cohort of TPP Program awardees. Ex. 1 (Tier 1 2023 NOFO); Ex. 2 (Tier 2 2023 NOFO). The 2023 NOFOs continued the Program's structure, inviting applicants to propose projects implementing or testing evidence-based interventions designed to reduce adolescent pregnancy and associated behavioral risk factors. As in prior funding cycles, the 2023 NOFOs distinguished between two principal categories of awards—Tier 1 and Tier 2—both for up to five-year project periods. Tier 1 2023 NOFO at 2; Tier 2 2023 NOFO at 2. Applications were evaluated using the criteria established in the 2023 NOFO. Tier 1 2023 NOFO at 43; Tier 2 2023 NOFO at 42.

8. In June 2026, however, HHS issued mass termination letters to nearly every cooperative agreement holder in the 2023–2028 funding cohort, including plaintiff Hennepin County.

9. Rather than replacing these cooperative agreements though the statutorily required competitive process, in mid- to late-September, HHS distributed a non-public Request for Quotation

(RFQ) to a few private companies holding General Services Administration (GSA) Multiple Award Schedule (MAS) contracts for generic Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services.

10. And on September 30, 2026, the last day of the 2026 fiscal year, HHS issued its unlawful $86.1 million task-order contract to Guidehouse, which purports to replace *all* of the nationwide Tier 1 TPP Program work that was being performed by Hennepin County and other public and private entities with expertise in teen pregnancy prevention.

11. Given that the United States District Court for the District of Columbia had already suspended the statutory lapse of these funds, HHS had no basis for its rushed and unlawful award decision. *See Hennepin County, Minnesota et al. v. U.S. Department of Health and Human Services et al.*, ECF 41, No. 1:26-cv-02460-CRC (D.D.C. 2026).

12. As established in this complaint, HHS's contract award was unlawful because it violates the Competition in Contracting Act, Federal Acquisition Regulation (FAR) Subpart 8.4, the 2026 Appropriations Act, and the Federal Grants and Cooperative Agreement Act.

**JURISDICTION, STANDING, AND TIMELINESS**

13. This Court possesses jurisdiction under 28 U.S.C. § 1491(b)(1). Although Hennepin County is also a plaintiff in *Hennepin County, Minnesota et al. v. U.S. Department of Health and Human Services et al.*, No. 1:26-cv-02460-CRC (D.D.C. 2026), that case does not trigger the jurisdictional bar in 28 U.S.C. § 1500 because the two cases are not based on substantially the same operative facts. *See Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013).

14. Hennepin County has standing because it is an interested party who would have submitted a proposal and won or had a substantial chance of winning a TPP Program contract but for HHS's unlawful conduct. *See* Ex. 3, Ashley Johnson Decl. ¶¶ 7-24.

15. Hennepin County's protest is timely because HHS did not publicly release its GSA MAS RFQ, and Hennepin County could not discover HHS's unlawful conduct until after HHS publicly released information about its award of the contract to Guidehouse. *See id.* at ¶¶ 25-27.[2]

## PARTIES

16. Plaintiff Hennepin County is a political subdivision of the State of Minnesota, with its county seat in Minneapolis. Through its public health department, Hennepin County supports the health and wellbeing of the county's 1.27 million residents. A cornerstone of Hennepin County Public Health's adolescent health programming is Better Together Hennepin, an initiative that works to help realize Hennepin County's vision of healthy, self-reliant citizens through the prevention of teen pregnancy. With funding from the TPP Program, Better Together Hennepin has placed health mentors in schools and clinics across the county, to provide classroom instruction and one-on-one support to students using evidence-based approaches to sexual health education.

17. Defendant is the United States, acting through HHS, including its Administration for Children and Families and the HHS acquisition office.

## FACTUAL BACKGROUND

### I. Congress directs HHS to award TPP Program funds through competitive contracts and grants to public and private entities

18. Congress created the TPP Program in the Consolidated Appropriations Act, 2010, which appropriated $110 million to HHS for "making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). Congress has renewed this authorization, with the same structure, in each subsequent appropriations cycle.

---

[2] By September 24, 2026, Hennepin County had become generally aware that HHS apparently intended to award the Tier 1 funds through a government contract. *See* ECF 42, No. 1:26-cv-02460-CRC (D.D.C. 2026). Hennepin County, however, could not discover the facts that led to this protest until after HHS awarded the task order to Guidehouse.

19. Under this structure, Congress has directed HHS to distribute TPP Program funds across two categories of awards, which HHS calls Tier 1 and Tier 2. *See* 2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173, 281 (2026).

20. Tier 1 awardees "replicat[e]" "medically accurate and age appropriate programs" that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." *Id.* For most of the Program's history, programs eligible for "replication" were identified by HHS through the agency's Teen Pregnancy Prevention Evidence Review, a process akin to expert peer review. As HHS explains, "[r]igorously evaluated programs that demonstrate positive outcomes are eligible to be implemented by TPP grant recipients in communities with the greatest need."[3]

21. Tier 2 awardees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" "additional models and innovative strategies for preventing teenage pregnancy." *Id.* In other words, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1106 (9th Cir. 2020).

22. Since its inception in 2009, HHS has administered the TPP Program through its staff in the Office of the Assistant Secretary for Health. It announced funding opportunities publicly through NOFOs, including in 2023, and awarded competitive cooperative agreements to local governments, nonprofit organizations, universities, and health systems. In June 2023 alone, HHS announced approximately $68.5 million in awards to 53 recipients in 29 states and Puerto Rico, including county and city health departments, universities, and nonprofit organizations. Prior to

[3] *About the Teen Pregnancy Prevention Program*, HHS Office of the Assistant Secretary for Health, https://perma.cc/KVF9-RRW3 (last visited October 12, 2026).

awarding the task-order contract at issue in this protest, HHS had never used a procurement contract to implement Tier 1 or Tier 2 of the TPP Program.

## II. The 2026 Appropriations Act

23. The 2026 Appropriations Act continued the TPP Program structure that Congress established in 2009. Under the heading for the Office of the Secretary, General Departmental Management, it appropriates $101 million to HHS "for making competitive contracts and grants to public and private entities" with up to 10 percent set aside for HHS's program costs:

> *Provided further*, That of the funds made available under this heading, *$101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy* and for the Federal costs associated with administering and evaluating such contracts and grants, of which not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and *of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factor*s, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy.

2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173, 281 (emphasis added).

24. HHS may therefore use no more than 10 percent of TPP funds for training and technical assistance, evaluation, outreach, and additional program support. Of the remaining amount, 75 percent is for replicating programs proven effective through rigorous evaluation (Tier 1), and 25 percent is for research and demonstration grants (Tier 2). *Id.* Applied to the $101 million appropriation, this means that HHS could use no more than approximately $10.1 million for the support category, approximately $68.2 million for Tier 1, and approximately $22.7 million for Tier 2.

25. Accordingly, even if HHS spent nothing on support, Tier 1 contracts and grants cannot exceed 75 percent of $101 million, or approximately $75.8 million. If HHS spent the full 10 percent on support, Tier 1 contracts and grants cannot exceed approximately $68.2 million.

26. HHS appears to have violated these statutory funding restrictions when it awarded the $86.1 million Tier 1 task-order contract to Guidehouse.

## III. Hennepin County's experience and ability to compete for and win TPP Program contracts

27. Hennepin County has participated in the TPP Program since its inception. Through Hennepin County Public Health and its adolescent health initiative, Better Together Hennepin, the County has been delivering evidence-based teen pregnancy prevention programming to adolescents since 2006. *See generally* Ex. 3, Ashley Johnson Decl. ¶¶ 5-19.

28. From 2010 to 2015, Hennepin County was one of HHS's initial partners in a rigorous evaluation of evidence-based programs. In 2023, it competed for and won a five-year multi-million-dollar Tier 1 cooperative agreement. *See id.*

29. Hennepin County delivers its Tier 1 programming through six community-based partners. It is registered to receive federal awards, has consistently reported TPP performance measures to HHS, and maintains relationships with schools, health providers, and community organizations across the County. Hennepin County's TPP programming has reached thousands of adolescents since it began participating in the Program in 2010.

30. On June 26, 2026, HHS terminated Hennepin County's cooperative agreement, as well as those of nearly all other TPP Program participants. Hennepin County remains ready, willing, and able to compete for TPP Program contracts, cooperative agreements, or grants under the competitive process required by the 2026 Appropriations Act and the Competition in Contracting Act, 41 U.S.C. §§ 3301-3312.

## IV. HHS issues a secret Tier I TPP Program RFQ under a generic GSA MAS contract for management and financial consulting

31. In mid- to late-September 2026, HHS issued RFQ 7571MN26Q00105 under a generic GSA MAS contract with a primary Special Item Number (SIN) of 541611, which covers

Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services.

32. The RFQ's secondary SINs were 54151S, Information Technology Professional Services; 54151HACS, Highly Adaptive Cybersecurity Services; and 611430, Professional and Management Development Training.

33. The RFQ's North American Industry Classification System (NAICS) code was 541611, which covers Administrative Management and General Management Consulting Services.

34. Nevertheless, the RFQ uses Product Service Code U009, which covers education and training services, not management consulting services. Moreover, the RFQ's "Acquisition Title" is "Adolescent Social and Youth Engagement Services," which reflects the teen pregnancy prevention services that Guidehouse is required to provide under the task-order contract.

35. The RFQ was not made publicly available. Upon information and belief, HHS only distributed the RFQ to a handful of the approximately 3,000 holders of the GSA MAS contract.

36. Although HHS knew that Hennepin County was a TPP Program awardee, HHS did not send Hennepin County the RFQ or inform the County about its existence.

37. Upon information and belief, the companies who received the RFQ were given less than a week to submit quotations for a first of its kind national procurement contract to redesign and reimplement HHS's entire Tier 1 TPP Program.

38. Under the RFQ, quotations were due at 12 p.m. EDT on September 29, 2026, which means that HHS had less than 36 hours to evaluate the quotations before it awarded the $86.1 million task-order contract to Guidehouse.

39. Upon information and belief, Guidehouse does not have *any* past performance or other experience implementing Tier 1 projects or other TPP Program work.

40. The RFQ contemplated the award of a single hybrid Firm-Fixed Price and Time-and-Materials two-year task order to establish a national resource center to deliver evidence-based teen pregnancy prevention programs that have been proven effective to adolescents and young adults, their parents, caregivers, and other youth-supporting professionals serving them, i.e., Tier 1 of the TPP Program.

41. The RFQ provided that the successful offeror must accomplish the following objectives:

- **Deliver high-quality adolescent programming.** Provide age appropriate, medically accurate, effective and evidence-informed educational and engagement activities directly to adolescents and young adults.

- **Engage youth as partners.** Establish meaningful mechanisms for adolescents and young adults to inform program design, implementation, improvement, and evaluation.

- **Engage parents and caregivers as partners.** Establish meaningful mechanisms for adolescents, parents and caregivers to inform program design, implementation, improvements and evaluation.

- **Create sustainable capability.** At completion, provide the Government with a mature, documented, scalable, and sustainable adolescent social services package to include deliverables due quarterly, annually, and at contract completion, as listed in Section VII.

42. The RFQ did not, however, require the successful offeror to immediately implement any evidence-based Tier 1 projects. Instead, the RFQ required the successful offeror to spend at least the first six months of the contract redesigning Tier 1 of the TPP Program.

43. The RFQ's objectives and statement of work are clearly outside the scope of the GSA MAS Contract, which covers Primary SIN 541611, Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services; Secondary SIN 54151S, Information Technology Professional Services; Secondary SIN 54151HACS, Highly Adaptive Cybersecurity Services; and Secondary SIN 611430, Professional and Management Development Training.

44. The RFQ's Technical Quotation Instructions further confirm that the purpose of the task-order contract is to redesign and reimplement Tier 1 of the TPP Program, which is outside the scope of the GSA MAS contract.

45. Specifically, these instructions required offerors to submit a Technical Volume that included the following factors explaining how they intend to redesign and reimplement a national Tier 1 TPP Program:

**Factor 1 - Technical and Program Approach**

- Demonstrate understanding of the purpose, adolescent/young-adult populations, parents/caregivers, youth-serving professionals, evidence-informed teen pregnancy prevention, and the integrated national operating model.
- Explain how direct youth services, training/TTA, youth leadership, parent/caregiver engagement, community partnerships, implementation support, performance measurement, CQI, knowledge management, and transition will function as one integrated system.
- Provide feasible sequencing, dependencies, milestones, assumptions, change-management methods, and national-scale delivery model.
- Explain how Government-approved evidence-informed/proven-effective programs will be implemented with fidelity and quality.

**Factor 2 - Adolescent and Young Adult Services**

- Describe program/site selection, youth recruitment, outreach, reach, engagement, retention, direct service delivery, safeguards, fidelity, and measurement.
- Demonstrate a scalable model capable of reaching approximately 100,000-150,000 adolescents annually while maintaining quality, accessibility, developmental appropriateness, and fidelity.
- Address underserved and hard-to-reach youth, geographic/transportation/language/disability/digital/socioeconomic barriers, partner capacity, surge capability, and metrics for reach, engagement, attrition, and disparities.
- Developmental and cultural responsiveness scenario: explain how an approved program would be delivered in two communities with substantially different cultural, linguistic, geographic, and access characteristics while incorporating youth input and maintaining fidelity.

- Describe youth safety, privacy/confidentiality, parental notification/participation where applicable, escalation of safety concerns, and compliance with applicable Federal, State, and local requirements.

**Factor 3 - Training, Technical Assistance, and Capacity Building**

- Explain needs identification, curriculum and educational product development, instructor-led/virtual/hybrid delivery, training-of-trainers, evaluation of training effectiveness, and use of feedback/data.

- Describe individualized TA, coaching, consultation, communities of practice, peer learning, implementation assistance, organizational capacity building, and follow-up support.

- Demonstrate that materials will be evidence-informed, technically accurate, developmentally appropriate, accessible, user-friendly, scalable, and suitable for sustained Government use.

- Demonstrate a national TTA model that maintains quality, consistency, responsiveness, and fidelity.

**Factor 4 - Youth Engagement, Partnerships, and Stakeholder Collaboration**

- Explain how adolescents and young adults will participate in program design, implementation, evaluation, communications, improvement, and leadership.

- Describe youth advisory councils, focus groups, peer leadership, feedback mechanisms, youth-led communications, and other advisory structures.

- Explain how youth recommendations will be documented, considered, incorporated, and communicated back to participants.

- Describe parent/caregiver engagement and partnerships with schools, community-based organizations, social-service organizations, healthcare providers, youth-serving agencies, faith/community organizations where appropriate, and other stakeholders.

- Describe collaboration, referral pathways, knowledge sharing, and coordinated service delivery.

46. Similarly, the RFQ’s evaluation criteria demonstrate that the purpose of the task-order contract is to implement Tier 1 of the TPP Program:

> The Government will evaluate quotations under the following six non-price factors. Each factor will be evaluated qualitatively based on the Government's assessment of the Quoter's understanding, proposed approach, feasibility, risks, and likelihood of successful performance.
>
> Factor 1 - Technical and Program Approach
> Factor 2 - Adolescent and Young Adult Services
> Factor 3 - Training, Technical Assistance, and Capacity Building
> Factor 4 - Youth Engagement, Partnerships, and Stakeholder Collaboration
> Factor 5 - Performance Measurement, Data, CQI, and Knowledge Management
> Factor 6 – Small Business Participation, Management, Staffing, Risk, Privacy/Security, and Transition

47. In apparent recognition of Guidehouse's lack of relevant past performance the RFQ provided that "[p]ast performance will be considered as part of the Government's overall best-value assessment *but will not be evaluated as a separate factor or assigned a confidence rating.*" (emphasis added).

48. Under the RFQ, HHS said it would award the task order based on a best-value tradeoff determination:

> The Government intends to place one hybrid FFP/T&M task order with the responsible, eligible GSA MAS contractor whose quotation represents the best overall value to the Government. The Government will make an integrated assessment of the six non-price evaluation factors, past performance, and Price. Past performance will be considered as part of the overall best-value assessment but will not be separately rated.
>
> The Government may select a higher-priced quotation when the additional non-price benefits justify the price premium or a lower-priced quotation when the additional benefits of a higher-priced quotation do not justify the additional price.
>
> The six non-price evaluation factors, when combined, are more important than Price. Price will become increasingly important as differences among quotations under the non-price factors decrease. The Contracting Officer will document the rationale for the best-value tradeoff and the determination of price reasonableness.

**V. HHS awards the task-order contract to Guidehouse**

49. According to www.usaspending.gov, on September 30, 2026, HHS awarded the task order to Guidehouse under its GSA schedule contract, No. GS-00F-045DA.

50. The task order has a total value of $86,122,613.24 and a period of performance that may be extended through March 29, 2029.

51. The task order's total value of $86.1 million constitutes approximately 86 percent of the $101 million that Congress appropriated for the TPP Program in fiscal year 2026.

52. If HHS used 86 percent (or any other amount that exceeds the 75 percent cap) on a single Tier 1 contract, it violated the 2026 Appropriations Act, which expressly provides that no more than 75 percent of the $101,000,000 may be used for competitively awarded Tier 1 contracts and grants to public and private entities. *See* 2026 Appropriations Act, 140 Stat. 173, 281.

**COUNT I**
**(Violation of the Competition in Contracting Act and FAR Subpart 8.4)**

53. Hennepin County repeats and realleges each of the preceding paragraphs as if fully set forth herein.

54. Under the Competition in Contracting Act, 41 U.S.C. §§ 3301-3312, and the FAR, HHS must obtain full and open competition through the use of competitive procedures when procuring goods and services, unless an express statutory exception applies.

55. Although FAR Subpart 8.4 establishes streamlined ordering procedures for acquiring supplies and services under GSA MAS contracts, HHS may only issue a task order under FAR Subpart 8.4 for supplies or services that fall within the scope of the underlying GSA MAS contract.

56. HHS cannot purchase out-of-scope goods and services under a GSA MAS task order without conducting a separate, full-and-open competition or executing a formal sole-source justification and approval pursuant to the Competition in Contracting Act and the FAR.

57. Under established Federal Circuit precedent, whether an order or modification falls within the scope of an underlying contract turns on whether the order represents a material departure from the scope of the procurement originally competed, such that potential offerors would reasonably have expected the work to fall within the original contract's scope. *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993).

58. The task order HHS issued to Guidehouse requires services, technical performance capabilities, and deliverables that materially exceed and depart from the baseline scope of the underlying GSA MAS contract.

59. Specifically, the task order's scope of work requires Guidehouse to design and implement a national Tier 1 TPP Program, including creating and delivering evidence-based teen pregnancy prevention programming directly to adolescents at a national scale with an expected reach of approximately 100,000 to 150,000 individuals per year.

60. In recognition of this scope of work, the RFQ uses Product Service Code U009, which covers education and training services, not management consulting. Moreover, the RFQ's "Acquisition Title" is "Adolescent Social and Youth Engagement Services," which reflects the teen pregnancy prevention services that Guidehouse is required to provide under the task order

61. The RFQ's work is not covered or contemplated under Guidehouse's GSA MAS contract, which is limited to Primary SIN 541611, Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services; Secondary SIN 54151S, Information Technology Professional Services; Secondary SIN 54151HACS, Highly Adaptive Cybersecurity Services; and Secondary SIN 611430, Professional and Management Development Training.

62. This work is also not covered or contemplated by Guidehouse's GSA MAS price list.

63. Instead, GSA's eLibrary describes Guidhouse's MAS contract as covering services that "provide operating advice and assistance on administrative and management issues," including management and financial consulting, acquisition and grants management support, and business program and project management.

64. Hennepin County and other potential offerors competing for the underlying GSA MAS contract could not have reasonably anticipated that the schedule would encompass the specialized, distinct, and extensive Tier 1 TPP Program requirements that HHS included in the challenged task order.

65. The out-of-scope requirements in the Guidehouse task order are not incidental or de minimis; they constitute the significant and core operational elements of the procurement.

66. By procuring out-of-scope requirements through the issuance of a task order under FAR Subpart 8.4 rather than conducting a separate competitive procurement, HHS violated the mandatory competition requirements in the Competition in Contracting Act and the FAR.

67. HHS failed to execute a justification and approval for other than full and open competition or satisfy any other statutory or regulatory exception to competition under 41 U.S.C. § 3304 or FAR 8.405-6 for the out-of-scope work.

68. HHS's decision to award the task order to Guidehouse under the GSA MAS contract was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of its statutory authority.

69. Hennepin County is an interested party with standing to bring this action because it is an actual or prospective offeror whose direct economic interest was affected by HHS's failure to compete the procurement. But for HHS's unlawful issuance of the out-of-scope task order, Hennepin County would have competed for the requirement in a full and open competition and had a substantial chance of receiving an award.

70. As a direct and proximate result of HHS's unlawful conduct, Hennepin County has suffered and continues to suffer competitive prejudice and irreparable harm, including the loss of the opportunity to compete for and perform a valuable federal contract.

**COUNT II**
**(Violation of the Competition in Contracting Act and the 2026 Appropriations Act)**

71. Hennepin County repeats and realleges each of the preceding paragraphs as if fully set forth herein.

72. Under the 2026 Appropriations Act, Congress appropriated dedicated funding for the TPP Program. *See* Pub. L. No. 119-75, 140 Stat. 173, 281.

73. Under the 2026 Appropriations Act, HHS must award TPP Program funds through Tier 1 and Tier 2 "*competitive contracts and grants to public and private entities*." *Id.* (emphasis added).

74. Congress's explicit statutory directive requires an open, competitive process accessible to both public and private entities, reflecting congressional intent that award opportunities funded through the TPP Program not be closed off or restricted to pre-existing commercial contract holders under a single GSA MAS contract.

75. Under the Competition in Contracting Act, 41 U.S.C. §§ 3301-3312, HHS must use competitive procedures that provide full and open competition when procuring goods or services, except where an express statutory exception applies.

76. Although FAR Subpart 8.404 provides that orders placed against a GSA MAS contract are generally considered to be issued using full and open competition, this regulatory exception does not—and cannot—supersede the 2026 Appropriations Act, which prohibits HHS from restricting competition or using non-competitive or restrictive ordering vehicles like a GSA MAS contract to award TPP Program contracts.

77. GSA MAS ordering procedures under FAR Subpart 8.4 are inherently limited to commercial entities holding pre-existing GSA schedule contracts. Public entities like Hennepin County

and other state and local government entities do not hold GSA MAS contracts and were therefore excluded from competing for the task order at issue in this protest.

78. In direct violation of the Competition in Contracting Act and the 2026 Appropriations Act, HHS failed to conduct a competitive procurement open to public and private entities. Instead, HHS funneled all (and likely more than all) of its Tier 1 TPP Program funds into a single $86.1 million out-of-scope GSA MAS task order to Guidehouse.

79. Making matters worse, HHS awarded this task order through a secretive process that did not include the public release of the RFQ and only invited quotations from a small number of entities.

80. By using the GSA MAS task-order process, HHS excluded Hennepin County and other public entities from competing for the TPP Program contract, in direct conflict with the mandatory text in the 2026 Appropriations Act that requires HHS to make "competitive" awards to "public and private entities."

81. HHS also violated the Competition in Contracting Act and the 2026 Appropriations Act by awarding just a single nationwide task order that used all of the Tier 1 appropriations, rather than conducting the broad competition contemplated by Congress. This single national award is inconsistent with the 2026 Appropriations Act, which requires HHS to award "contracts and grants" in the plural.

82. HHS possessed no statutory authority or discretion to waive, alter, or circumvent the specific competitive award requirements that Congress mandated for TPP Program contracts.

83. HHS did not execute a valid justification and approval under 41 U.S.C. § 3304 or the FAR to justify restricting competition, nor could an administrative justification override the express statutory mandates in the 2026 Appropriations Act.

84. HHS's award of the task order to Guidehouse in violation of the Competition in Contracting Act and the 2026 Appropriations Act was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of its statutory authority.

85. Hennepin County is an interested party with standing to bring this action because it is an actual or prospective offeror whose direct economic interest was affected by HHS's failure to comply with the Competition in Contracting Act and the 2026 Appropriations Act. But for HHS's unlawful conduct, Hennepin County would have competed for the requirement in a full and open competition and had a substantial chance of receiving an award.

86. As a direct and proximate result of HHS's unlawful conduct, Hennepin County has suffered and continues to suffer competitive prejudice and irreparable harm, including the loss of the opportunity to compete for and perform a valuable federal contract.

**COUNT III**
**(Violation of the Federal Grants and Cooperative Agreement Act and the 2026 Appropriations Act)**

87. Hennepin County repeats and realleges each of the preceding paragraphs as if fully set forth herein.

88. The Federal Grants and Cooperative Agreement Act (FGCAA), 31 U.S.C. §§ 6301–6308, requires federal agencies to select the appropriate legal instrument to govern their financial relationships based on the "principal purpose" test.

89. Under 31 U.S.C. § 6303, an agency must use a procurement contract when the principal purpose of the instrument is to acquire goods and services for the government's direct benefit:

> An executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—
>
> > (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or

> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

90. Under 31 U.S.C. § 6305, an agency must use a cooperative agreement when the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation:

> An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—
>
> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
>
> (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

91. The statutory objective of the TPP Program is funding, supporting, and stimulating the implementation of evidence-based teen pregnancy prevention models and programs in communities across the country. *See* 2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173, 281.

92. Thus, consistent with 31 U.S.C. § 6305, the principal purpose of the "relationship" between HHS and TPP Program funded recipients is to transfer federal funds to public and private entities to carry out a public purpose of support or stimulation, not the acquisition of goods and services for HHS's direct benefit or use.

93. Consistent with the TPP Program's purpose, from 2009 to September 30, 2026, HHS implemented the TPP Program by awarding competitive cooperative agreements to public and private entities.

94. In June 2026, however, HHS abruptly terminated virtually all existing TPP Program cooperative agreements nationwide, citing a purported change in agency priorities.

95. Then, on September 30, 2026—the last day of the fiscal year—HHS awarded a single procurement task order under a GSA MAS contract to Guidehouse, obligating the entirety of the TPP Program's 2026 Tier 1 funds under that single ordering vehicle.

96. The task order's principal purpose is not the acquisition of property or services for the government's direct benefit within the meaning of 31 U.S.C. § 6303.

97. Instead, the task order's principal purpose is transferring a thing of value to carry out a public purpose of support or stimulation within the meaning of 31 U.S.C. § 6305.

98. By converting the entire Tier 1 TPP Program assistance mechanism into a single commercial procurement contract, HHS unlawfully used a procurement contract where the FGCAA and the 2026 Appropriations Act require the use of grants and cooperative agreements for most (if not all) of the task order's scope of work.

99. HHS's termination of its Tier 1 cooperative agreements and subsequent award of a single GSA MAS task order was an unlawful effort to circumvent the statutory requirements of the FGCAA and the 2026 Appropriations Act.

100. HHS's decision to award all of its Tier 1 funds through a single GSA MAS task order was arbitrary, capricious, an abuse of discretion, contrary to law. and in excess of its statutory authority. HHS failed to consider the relevant statutory factors, disregarded the mandatory criteria of 31 U.S.C. §§ 6303 and 6305, and offered no rational explanation for its decision to stop awarding Tier 1 funds through cooperative agreements.

101. Hennepin County is an interested party with standing to bring this action because it is an actual or prospective offeror (and former cooperative agreement holder) whose direct economic interest was affected by HHS's failure to comply with the FGCAA and the 2026 Appropriations Act. But for HHS's unlawful conduct, Hennepin County would have competed for the requirement in a full and open competition and had a substantial chance of receiving an award.

102. As a direct and proximate result of HHS's unlawful conduct, Hennepin County has suffered and continues to suffer competitive prejudice and irreparable harm, including the loss of the opportunity to compete for and perform a valuable federal cooperative agreement or contract.

**PRAYER FOR RELIEF**

WHEREFORE, Hennepin County respectfully requests that the Court grant the following relief:

a. For Count I, (i) declare that HHS's award of the task order to Guidehouse was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of its statutory authority; (ii) issue preliminary and permanent injunctions preventing HHS from allowing Guidehouse to continue performance of the unlawful task order; and (iii) order HHS to terminate the task order and award the TPP Program funds as required by law;

b. For Count II, (i) declare that HHS's award of the task order to Guidehouse was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of its statutory authority; (ii) issue preliminary and permanent injunctions preventing HHS from allowing Guidehouse to continue performance of the unlawful task order; and (iii) order HHS to terminate the task order and award the TPP Program funds as required by law;

c. For Count III, (i) declare that HHS's award of the task order to Guidehouse was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of its statutory authority; (ii) issue preliminary and permanent injunctions preventing HHS from allowing Guidehouse to continue performance of the unlawful task order; and (iii) order HHS to terminate the task order and award the TPP Program funds as required by law;

d. Award reasonable costs, expenses, and attorney's fees under 28 U.S.C. § 2412 or any other applicable provision of law; and

e. Grant such other and further relief as the Court deems just and proper.[4]

Dated: October 14, 2026

Respectfully submitted,


s/ Joshua D. Schnell
Joshua D. Schnell*
Anna L. Dichter
Cordatis LLP
4250 North Fairfax Drive
Suite 600
Arlington, VA 22203
(202) 342-2550
jschnell@cordatislaw.com
adichter@cordatislaw.com

Michael J. Torcello**
Kate Talmor**
Carrie Y. Flaxman**
Robin F. Thurston**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
mtorcello@democracyforward.org
ktalmor@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Hennepin County*

* *Attorney of Record*

** *Motion for Pro Hac Admission Forthcoming*


[4] Hennepin County respectfully reserves its rights to seek a temporary restraining order or preliminary injunction under RCFC 65 and Appendix C and to supplement this complaint upon the government's production of the administrative record.